**25-60694**
**consolidated with**
**26-60013**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Vapor Technology Association; MS Small VTC Businesses Association Corporation, doing business as MS Small Businesses Alliance; Hema Monica, L.L.C.; The Smokey Guys, Incorporated; Byram Vape Empire, Incorporated; MS Vapors, L.L.C.; Vape Empire, Incorporated; Smoke City Lucedale, L.L.C.; Revive Lucedale, L.L.C.; Revive Hurley, L.L.C.; TJ Patel, L.L.C.; NUP 2, L.L.C.,

Plaintiffs - Appellants

v.

Chris Graham, Mississippi Commissioner of Revenue,

Defendant – Appellee

---

On Appeal from
United States District Court for the Southern District of Mississippi (Southern)
Case No. 1:25-cv-00336-LG-BWR

---

# BRIEF OF PLAINTIFFS-APPELLANTS

---

SUBMITTED BY:

Charles E. Ross (MSB #5683)
James C. Simpson, Jr. (MSB #6810)
Jack F. Hall (MSB #106482)
WISE CARTER CHILD & CARAWAY, P.A.

Post Office Box 651, Jackson, MS 39205
401 E. Capitol St., Heritage Bldg., Suite 600, Jackson, MS 39201
Telephone: 601-968-5500
Facsimile: 601-944-7718
cer@wisecarter.com
jcs@wisecarter.com
jfh@wisecarter.com
*Attorneys for Plaintiffs – Appellants*

# CERTIFICATE OF INTERESTED PERSONS
**25-60694**
**consolidated with**
**26-60013**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| **Appellee:** | **Counsel for Appellee:** |
| --- | --- |
| Chris Graham, Mississippi Commissioner of Revenue | John P. Sneed, Lisa A. Reppeto, and Justin L. Matheny of the Mississippi Attorney General's Office Jackson, Mississippi |

| **Appellants:** | **Counsel for Appellants:** |
| --- | --- |
| Vapor Technology Association; MS Small VTC Businesses Association Corporation, doing business as MS Small Businesses Alliance; Hema Monica, L.L.C.; The Smokey Guys, Incorporated; Byram Vape Empire, Incorporated; MS Vapors, L.L.C.; Vape Empire, Incorporated; Smoke City Lucedale, L.L.C.; Revive Lucedale, L.L.C.; Revive Hurley, L.L.C.; TJ Patel, L.L.C.; and NUP 2, L.L.C. | Charles E. Ross, James C. Simpson, Jr., Beau M. Bettiga, and Jack F. Hall of Wise Carter Child & Caraway, P.A. Jackson, Mississippi |

*<u>/s/ Charles E. Ross</u>*
CHARLES E. ROSS
Attorney of record for Appellants

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves the District Court's denial of preliminary injunctive relief and its subsequent dismissal of this lawsuit for lack of standing. Plaintiffs-Appellants Vapor Technology Association; MS Small VTC Businesses Association Corporation, doing business as MS Small Businesses Alliance; Hema Monica, L.L.C.; The Smokey Guys, Incorporated; Byram Vape Empire, Incorporated; MS Vapors, L.L.C.; Vape Empire, Incorporated; Smoke City Lucedale, L.L.C.; Revive Lucedale, L.L.C.; Revive Hurley, L.L.C.; TJ Patel, L.L.C.; and NUP 2, L.L.C., ("Plaintiffs") seek vacatur and reversal of the District Court's erroneous dismissal of this lawsuit and reversal of the denial of preliminary injunctive relief. The District Court should enter preliminary injunctive relief on remand. Plaintiffs respectfully request oral argument.

*/s/ Charles E. Ross*
CHARLES E. ROSS
Attorney of record for Appellants

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................ ii

TABLE OF CONTENTS ........................................................................... iii

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT .............................................................. 1

STATEMENT OF THE ISSUES .................................................................. 2

STATEMENT OF THE CASE ..................................................................... 2

I. Relevant facts. ............................................................................ 2

a. Parties and background. .................................................... 2

b. Federal regulation and discretionary enforcement. ............ 2

c. Mississippi House Bill 916. ............................................... 8

d. Harms caused by the Commissioner's enforcement of H.B. 916. . 10

II. Procedural history ..................................................................... 13

SUMMARY OF THE ARGUMENT ......................................................... 14

ARGUMENT ............................................................................................ 15

I. The District Court erred by dismissing this lawsuit for lack of standing. ................................................................................. 16

a. Standard of review. .......................................................... 16

b. Plaintiffs have shown standing to challenge H.B. 916 at the preliminary injunction stage of litigation......................................16

c. Plaintiffs have further shown associational standing.....................24

d. This Court's motions panel holding does not bind this Court's merits panel standing analysis..................................................................25

II. The District Court erred by denying preliminary injunctive relief.....27

a. Standard of review. ....................................................................27

b. Plaintiffs are entitled to a preliminary injunction. .........................28

1. Plaintiffs have a strong likelihood of success on their preemption claim...........................................................................................29

A. 21 U.S.C. § 337(a) vests exclusive enforcement of the premarket review process with FDA, thereby impliedly preempting H.B. 916, which seeks to enforce the TCA's premarket review requirements. ........................................31

B. The TCA's preservation and savings clauses do not overcome FDA's exclusive enforcement of the TCA's premarket review requirements.......................................................................44

C. The Seventh Circuit erred in its preemption holding in an analogous case. ...................................................................48

D. The presumption against preemption does not apply. .........49

2. The remaining factors support preliminary injunctive relief....51

A. Plaintiffs are suffering irreparable harm.............................51

B. The Commissioner and the public will not be harmed by enjoining enforcement of H.B. 916. ...................................53

CONCLUSION ........................................................................................54

CERTIFICATE OF SERVICE ......................................................................56

CERTIFICATE OF COMPLIANCE ...........................................................57

# TABLE OF AUTHORITIES

**Cases**

*ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*
645 F.3d 954 (8th Cir. 2011) ....................20

*Abramski v. United States*
573 U.S. 169 (2014)....................31

*Arizona v. United States*
567 U.S. 387 (2012).................... 33, 37-38, 40, 49

*Ass'n of Data Processing Service Organizations, Inc. v. Camp*
397 U.S. 150 (1970)....................15, 19

*Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*
894 F.3d 692 (5th Cir. 2018) ....................28

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*
875 F.2d 1174 (5th Cir. 1989) ....................13

*Bell v. Redflex Traffic Sys., Inc.*
374 F. App'x 518 (5th Cir. 2010) .................... 18-19

*Biden v. Nebraska*
600 U.S. 477 (2023)....................21

*Book People, Inc. v. Wong*
91 F.4th 318 (5th Cir. 2024) ....................53

*Bouarfa v. Mayorkas*
604 U.S. 6 (2024)....................22

*BST Holdings, L.L.C. v. OSHA*
17 F.4th 604 (5th Cir. 2021) ....................52

*Buckman Co. v. Plaintiffs' Legal Comm.*
531 U.S. 341 (2001) ............................................................ 32-36, 39, 42-44, 50-51

*Buenrostro-Mendez v. Bondi*
166 F.4th 494 (5th Cir. 2026) ..........................................................................26

*California v. Zook*
336 U.S. 725 (1949)...........................................................................................43

*Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*
515 F. App'x 451 (6th Cir. 2013) ......................................................................20

*City of Austin v. Paxton*
943 F.3d 993 (5th Cir. 2019) ...................................................................... 12, 52-53

*City of Oakland v. Lynch*
798 F.3d 1159 (9th Cir. 2015) ..........................................................................22

*Cole v. City of Dallas*
314 F.3d 730 (5th Cir. 2002) ............................................................................28

*Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*
579 U.S. 115 (2016)...........................................................................................50

*Cottrell v. Alcon Lab'ys*
874 F.3d 154 (3d Cir. 2017)...............................................................................20

*Crosby v. Nat'l Foreign Trade Council*
530 U.S. 363 (2000)...................................................................................... 30-31

*DiCroce v. McNeil Nutritionals, LLC*
82 F.4th 35 (1st Cir. 2023).................................................................................36

*Epic Sys. Corp. v. Lewis*
584 U.S. 497 (2018)...........................................................................................47

*FDA v. All. for Hippocratic Med.*

602 U.S. 367 (2024)....16, 21

*Freightliner Corp. v. Myrick*
514 U.S. 280 (1995)....30-31, 38, 49

*Geier v. Am. Honda Motor Co.*
529 U.S. 861 (2000)....45

*Heckler v. Chaney*
470 U.S. 821 (1985)....3, 18, 30, 36-37, 39

*Hughes v. Boston Scientific Corp.*
631 F.3d 762 (5th Cir. 2011)....3-4

*In re Special Grand Jury 89-2*
450 F.3d 1159 (10th Cir. 2006)....20

*Iowa Migrant Movement for Just. v. Bird*
157 F.4th 904 (8th Cir. 2025)....22, 53-54

*Iowans for Alts. to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*
781 F. Supp. 3d 724 (S.D. Iowa 2025)....8

*Jensen v. Rhode Island Cannabis Control Comm'n*
160 F.4th 18 (1st Cir. 2025)....22

*Lofton v. McNeil Consumer & Specialty Pharms.*
672 F.3d 372 (5th Cir. 2012)....35-36, 44, 51

*Loreto v. Procter & Gamble Co.*
515 F. App'x 576 (6th Cir. 2013)....36

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992)....20-21

*Mattern v. Eastman Kodak Co.*
104 F.3d 702 (5th Cir. 1997)....26

*Miles v. Apex Marine Corp.*
498 U.S. 19 (1990)....36

*Nat'l Ass'n for the Advancement of Colored People, NAACP v. Tindell*
95 F.4th 212 (5th Cir. 2024) .......................................................................... 21-22

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*
719 F.3d 338 (5th Cir. 2013) ..........................................................................16, 28

*NetChoice, L.L.C. v. Fitch*
134 F.4th 799 (5th Cir. 2025) .......................................................................... 24-25

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*
491 U.S. 350 (1989)..........................................................................................52

*Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*
48 F.4th 1040 (9th Cir. 2022) ..........................................................................43

*Nken v. Holder*
556 U.S. 418 (2009)..........................................................................................51

*Parker v. D.C.*
478 F.3d 370 (D.C. Cir. 2007)..........................................................................20

*Perez v. Nidek Co.*
711 F.3d 1109 (9th Cir. 2013) ..........................................................................36

*QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*
95 F.4th 984 (5th Cir. 2024) ..........................................................................8

*R. J. Reynolds Tobacco Co. v. City of Edina*
60 F.4th 1170 (8th Cir. 2023) ..........................................................................45

*R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*
29 F.4th 542 (9th Cir. 2022) ..........................................................................45

*Rest. L. Ctr. v. D.O.L.*
66 F.4th 593 (5th Cir. 2023) ..........................................................................28

*Rubin v. Islamic Republic of Iran*
583 U.S. 202 (2018)..........................................................................................46

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*
547 U.S. 47 (2006) ....................................................................................24

*Sch. Bd. of Avoyelles Par. v. U.S. Dep't of Interior*
647 F.3d 570 (5th Cir. 2011) .......................................................................51

*Siders v. City of Brandon, Mississippi*
123 F.4th 293 (5th Cir. 2024) ..................................................................28, 51

*South Carolina v. Catawba Indian Tribe, Inc.*
476 U.S. 498 (1986)....................................................................................48

*Space Expl. Techs. Corp. v. NLRB*
151 F.4th 761 (5th Cir. 2025) ......................................................................54

*Speech First, Inc. v. Fenves*
979 F.3d 319 (5th Cir. 2020) .......................................................................16

*Texans for Free Enter. v. Tex. Ethics Comm'n*
732 F.3d 535 (5th Cir. 2013) .......................................................................54

*Texas v. EPA*
829 F.3d 405 (5th Cir. 2016) .......................................................................53

*Texas Trib. v. Caldwell Cnty., Texas*
121 F.4th 520 (5th Cir. 2024) .................................................................. 20-21

*Trevino v. Davis*
861 F.3d 545 (5th Cir. 2017) .......................................................................26

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*
517 U.S. 544 (1996)............................................................................... 24-25

*United States v. Arizona*
641 F.3d 339 (9th Cir. 2011) .......................................................................52

*United States v. Johnson*
632 F.3d 912 (5th Cir. 2011) .................................................................. 20-21

*VanDerStok v. Garland*

633 F. Supp. 3d 847 (N.D. Tex. 2022) ....................53

*Vapor Tech. Ass'n v. FDA*
977 F.3d 496 (6th Cir. 2020) ....................5

*Vapor Tech. Ass'n v. Graham*
167 F.4th 302 (5th Cir. 2026) ....................14, 25, 27

*Veasey v. Abbott*
870 F.3d 387 (5th Cir. 2017) ....................26

*Wages & White Lion Invs., L.L.C. v. FDA*
16 F.4th 1130 (5th Cir. 2021) ....................52

*Warth v. Seldin*
422 U.S. 490 (1975) ....................24

*Wildman v. Medtronic, Inc.*
874 F.3d 862 (5th Cir. 2017) ....................35, 44

*Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*
172 F.4th 976, (7th Cir. 2026) ....................23, 48-49

*Wos v. E.M.A. ex rel. Johnson*
568 U.S. 627 (2013) ....................30

*Wyeth v. Levine*
555 U.S. 555 (2009) ....................31, 43

*Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*
134 F.4th 326 (5th Cir. 2025) ....................39-44

*303 Creative LLC v. Elenis*
600 U.S. 570 (2023) ....................17

**Statutes, Regulations & Rules**

21 C.F.R. § 1308.11 ....................22

21 U.S.C. § 321(rr)(1) ....................5, 9

21 U.S.C. § 331 ........................................................................................4

21 U.S.C. § 332 ......................................................................................38

21 U.S.C. § 333 ......................................................................................38

21 U.S.C. § 334 ......................................................................................38

21 U.S.C. § 335 ......................................................................................38

21 U.S.C. § 337 ..................................................................................passim

21 U.S.C. § 355 ......................................................................................42

21 U.S.C. § 387b ......................................................................................4

21 U.S.C. § 387g ....................................................................................30

21 U.S.C. § 387j ................................................................ 4, 8, 15, 38-39

21 U.S.C. § 387p ................................................................................passim

21 U.S.C. § 844 ......................................................................................22

28 U.S.C. § 1331 ......................................................................................2

28 U.S.C. § 1291 ......................................................................................2

28 U.S.C. § 1292 ......................................................................................2

28 U.S.C. § 1343 ......................................................................................2

28 U.S.C. § 1367 ......................................................................................2

28 U.S.C. § 2201 ......................................................................................1

42 U.S.C. § 1983 ......................................................................................2

House Bill 916, 2025 Miss. Gen. Laws Ch. 409 ...................................passim

Miss. Code Ann. § 75-102-1 .......... 8-9, 33

Miss. Code Ann. § 75-102-2 .......... passim

MISS. CONST. art. III, § 14 .......... 2

MISS. CONST. art. III, § 32 .......... 2

Pub. L. No. 75-717, 52 Stat. 1040 (1938) .......... 1, 3

Pub. L. No. 111-31, 123 Stat. 1776 (2009) .......... 4, 42

Pub. L. No. 117-103, 136 Stat. 49 (2022) .......... 5, 40

U.S. CONST. art. VI, § II .......... 1

81 F.R. 28973 .......... 3-5

Fed. R. App. P. 4 .......... 2

Fed. R. App. P. 27 .......... 26

**Other Authorities**

ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) .......... 31, 49-50

*Enforcement Priorities for Certain New Tobacco Products Marketed without Premarket Authorization, Guidance for Industry*, FDA (May 2026) https://www.fda.gov/media/192403/download .......... passim

*FDA, Regulatory Procedures Manual*, July 2024 https://www.fda.gov/media/71878/download .......... 38

*Guidance for Industry, Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, FDA (April 2020) https://www.fda.gov/media/133880/download .......... passim

*Letter from FDA to the U.S. International Trade Commission*, dated October 27, 2023 ....................6

*Searchable Tobacco Products Database*, FDA https://www.accessdata.fda.gov/scripts/searchtobacco/ ....................10

*Unapproved Drugs*, FDA (May 9, 2024) https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs ....................22

*Wells Pharma of Houston, L.L.C., Petitioner, v. Zyla Life Sciences, L.L.C.*, Respondent (U.S. Nov. 17, 2025) (No. 25-257) ....................42

## INTRODUCTION

Congress gave the Food and Drug Administration ("FDA") exclusive enforcement authority regarding premarket review of electronic nicotine delivery system ("ENDS") products. In 2020, FDA issued a policy directive that has deferred enforcement of premarket review against these products to avoid market removal and, consequently, the reversion to traditional cigarettes by current ENDS users. FDA reiterated its enforcement objective of continued market access to ENDS products on May 8, 2026. The Mississippi Legislature, however, overruled Congress by enacting H.B. 916, which regulates premarket authorization of ENDS products in a way that is completely different from FDA's enforcement decisions. Under this law, non-tobacco-derived ENDS products are illegal in Mississippi for their lack of premarket authorization. This is inconsistent with FDA's exclusive enforcement discretion as entrusted to it by Congress, which allows such products to be sold. H.B. 916 is preempted by federal law, and its enforcement should be enjoined.

## JURISDICTIONAL STATEMENT

Plaintiffs assert claims under the Supremacy Clause of the U.S. Constitution, U.S. CONST. art. VI, § II; the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution; the Federal Food, Drug, and Cosmetic Act, 52 Stat. 1040 (1938) *et seq.*; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*; and

Mississippi's equal protection guarantees, MISS. CONST. art. III, §§ 14 and 32. ROA.14-20. The District Court has jurisdiction over this lawsuit under 42 U.S.C. § 1983, 28 U.S.C. § 1343, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.

The District Court denied Plaintiffs' Motion for Preliminary Injunction. ROA.652-672, RE.18-38. The District Court subsequently dismissed this lawsuit for lack of standing and entered a final judgment. ROA.848-858, RE.39-49. The District Court later denied Plaintiffs' post-judgment motions. ROA.920-921. Plaintiffs timely filed their Notice of Appeal in accordance with Fed. R. App. P. 4(a)(1)(A). ROA.846-847, RE.14-15; ROA.918-919, RE.16-17. Jurisdiction is proper in this Court under 28 U.S.C. §§ 1291 and 1292.

## STATEMENT OF THE ISSUES

1. Whether the District Court erred in dismissing this lawsuit for lack of standing.
2. Whether the District Court erred in denying Plaintiffs' Motion for Preliminary Injunction.

## STATEMENT OF THE CASE

### I. Relevant facts.

#### a. Parties and background.

ENDS products, also known as electronic cigarettes, are alternatives to traditional cigarettes that are less harmful because they do not contain tobacco,

involve combustion, or generate smoke, tar, or ash. ROA.398.[1] There are two types of ENDs products: those that use tobacco-derived nicotine, and those that use non-tobacco-derived nicotine. The nicotine is identical. ROA.400. Plaintiffs are retailers, distributors, and wholesalers of non-tobacco-derived ENDS products and trade associations with missions related to ENDS products. ROA.17-19. The Mississippi Commissioner of Revenue (the "Commissioner") is charged with enforcing H.B. 916, which Plaintiffs challenge in this lawsuit. *See* Miss. Code Ann. § 75-102-2. ROA.19.

**b. Federal regulation and discretionary enforcement.**

In 1938, Congress enacted the Federal Food, Drug, and Cosmetic Act ("FDCA") "[t]o prohibit the movement in interstate commerce of adulterated and misbranded food, drugs, devices, and cosmetics." Pub. L. No. 75-717, 52 Stat. 1040 (1938). Congress gave FDA exclusive authority to enforce the law. *See* 21 U.S.C. § 337(a) ("all such proceedings for the enforcement…of this chapter shall be by…the United States."). FDA has ***total enforcement discretion*** of the FDCA. *See Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (the FDCA "commit[s] complete discretion to the [FDA] to decide how and when [FDA's enforcement authority] should be exercised."); *accord, Hughes v. Boston Scientific Corp.*, 631 F.3d 762, 774

[1] *See* 81 F.R. 28973, 28981 (May 10, 2016).

(5th Cir. 2011) ("[T]he FDA has…discretion to undertake any enforcement method it chooses to remedy violations…").

In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"), codified in subchapter IX of the FDCA, to grant FDA authority over traditional tobacco products. *See* Pub. L. No. 111-31, 123 Stat. 1776 (2009). Under this amendment, new tobacco products must receive premarket authorization by FDA under the TCA's premarket tobacco product application ("PMTA") process. *See* 21 U.S.C. § 387j. The FDCA prohibits the sale of products without premarket authorization as being "adulterated" products. *See* 21 U.S.C. §§ 387b(6)(A); 331. Though the TCA preserves limited state authority to regulate sales, *see* U.S.C. § 387p(a)(1), states are preempted from altering the TCA's premarket review process. *See id.* at (a)(2)(A) ("No State…may establish…any requirement which is different from, or in addition to, any requirement…relating to tobacco product standards [or] ***premarket review***…") (emphasis added).

In August 2016, FDA's regulatory oversight of tobacco products extended to ENDS products containing tobacco-derived nicotine. *See* 81 F.R. 28973 (May 10, 2016). Rather than forcing these products off the market for lack of premarket authorization, FDA issued an agenda policy in April 2020 whereby manufacturers

were given until September 9, 2020, to file a PMTA.[2] FDA specifically stated that it "intend[ed] to prioritize enforcement of any ENDS product" offered for sale after that date that was ***not*** subject to a filed PMTA. *Id.* at 3. In 2022, Congress amended the FDCA to extend FDA's authority to include ***non***-tobacco-derived ENDS products. *See* Pub. L. No. 117-103, 136 Stat. 49, § 111(a)(1) (2022); 21 U.S.C. § 321(rr)(1). Manufacturers were given 60 days to file a PMTA. *See* Pub. L. No. 117-103, 136 Stat. 49, § 111(d)(2)(A) (2022).

Although PMTAs have been filed for most ENDS products on the market, FDA has resolved very few of them. There were countless ENDS products on the market when FDA authority expanded in both 2016 and 2022. These products lacked premarket authorization. So, FDA used—and continues to use—its enforcement discretion to avoid forcing these products off the market for lack of premarket authorization because ENDS users would then likely revert to cigarettes or seek "black market" ENDS products. *See* 81 F.R. 28973, 28977-78; *Vapor Tech. Ass'n v. FDA*, 977 F.3d 496, 499 (6th Cir. 2020) (forcing products off the market would be a "public health outcome that should be avoided if at all possible."); ROA.302.

---

[2] *See Guidance for Industry, Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, FDA (April 2020), https://www.fda.gov/media/133880/download (hereinafter, "Guidance for Industry").

FDA has limited its "action regarding [ENDS products] that are marketed without premarket authorization, including as warranted based on changed circumstances, new information, or to better address minors' use of those products."[3] Thus, FDA has exercised its discretion to enforce the PMTA process on a "case-by-case" basis, simultaneously withholding: (1) premarket authorization of ENDS products; and (2) enforcement against the sale or distribution of unauthorized ENDS products in most cases.[4]

Most recently, on May 8, 2026, FDA issued a new guidance, *Enforcement Priorities for Certain New Tobacco Products Marketed without Premarket Authorization, Guidance for Industry* ("*2026 Guidance for Industry*"), clearly laying out FDA's current approach to enforcement.[5] Under FDA's clearly stated new policy on enforcement, FDA "does not intend to prioritize enforcement of the premarket authorization requirement" against ENDS products where the product:

- is subject to an application that is pending, and the application has been accepted and filed…that has been accepted and pending for more than 180 days; and

---

[3] *See Guidance for Industry* at 3.

[4] *See id.* at 9; *see also Letter from FDA to the U.S. International Trade Commission*, dated October 27, 2023, available at ROA.133 ("FDA…has sought to strike a balance between the serious risk that e-cigarettes pose to youth and their potential benefit in helping adult smokers completely transition from or significantly reduce smoking combustible cigarettes.").

[5] Available at: https://www.fda.gov/media/192403/download. This guidance noted that FDA's April 2020 guidance "is withdraw[n]" but still "relevant and helpful." *Id.*

- for nontobacco-flavored ENDS products,[6] if FDA has determined that the application also includes data necessary to evaluate whether such product is appropriate for…protection of…public health.

*Id.* at 3 (footnotes omitted). This policy further states that FDA "will create and maintain a public-facing webpage (i.e., a directory) identifying manufacturers and their associated products that FDA generally does not intend to prioritize enforcement against." *Id.* at 4.[7] This guidance ***does not*** distinguish between tobacco-derived and non-tobacco-derived nicotine.[8] Moreover, this guidance eliminates FDA's enforcement based on pre-set deadlines for the filing of PMTAs.

Simply put, FDA, in its discretion, has once again staked out its broad authority not to take enforcement action against most ENDS products on the market. FDA does so with full knowledge and by clearly stating this policy for products ***it*** deems illegal. This policy amounts to *de facto* permission to sell ENDS products subject to oversight by FDA pending a PMTA decision. That is the longstanding,

[6] This term refers to nontobacco-***flavored*** ENDS products, which should not be confused with non-tobacco-***derived*** ENDS products. The 2026 Guidance applies both to tobacco-derived and non-tobacco-derived ENDS products without the distinction embedded in H.B. 916.

[7] Critically, FDA's *2026 Guidance for Industry* shows the District Court erred in holding that ENDS products are federally illegal based on its belief that "the deferred enforcement period has now expired." ROA.850, RE.41. Although this document was released after the District Court's ruling, its statement that FDA's 2020 *Guidance for Industry* "continue[s] to be relevant and helpful" shows that case-by-case deferred enforcement remained in effect at the time the District Court ruled.

[8] Moreover, this guidance is for "Industry," indicating that FDA intends industry members (such as Plaintiffs) to rely upon this guidance as to how FDA will exercise its enforcement discretion.

deliberate, and settled strategy of FDA's exclusive enforcement of the FDCA regarding ENDS products.

**c. Mississippi House Bill 916.**

In 2025, however, the Mississippi Legislature "took the reins" from FDA—despite FDA's exclusive enforcement authority—and enacted House Bill 916, 2025 Miss. Gen. Laws Ch. 409, codified at Miss. Code Ann. §§ 75-102-1 and 75-102-2. H.B. 916 requires the Commissioner of Revenue to create a directory of ENDS products that may be lawfully sold in Mississippi. H.B. 916 cross-references, depends on, and incorporates 21 U.S.C. § 387j, the TCA's premarket review provision. *See* Miss. Code Ann. §§ 75-102-1 and 75-102-2. H.B. 916 requires ENDS products to undergo the PMTA process and obtain premarket authorization as a condition for market access in Mississippi. *See* Miss. Code Ann. § 75-102-2(1)(a). This enactment indicates the Legislature's dissatisfaction with FDA's enforcement of the FDCA[9] and its preference for state enforcement of federal law.[10]

---

[9] The Legislature's dissatisfaction is shown by H.B. 916's incorporation of the TCA, which shows the Legislature prefers the Commissioner enforce the FDCA. Of course, "what the legislature says in the text of a statute is…the best evidence of legislative intent." *QBE Syndicate 1036 v. Compass Mins. Louisiana, Inc.*, 95 F.4th 984, 992 (5th Cir. 2024) (citation omitted).

[10] Aside from state usurpation of federal enforcement, one district court acknowledged the protracted lobbying effort by large tobacco companies in passing analogous state laws to protect their economic interests in the sale of tobacco-derived nicotine. *See Iowans for Alternatives to Smoking & Tobacco, Inc. v. Iowa Dep't of Revenue*, 781 F. Supp. 3d 724, 729 (S.D. Iowa 2025).

H.B. 916, however, permits the sale of ENDS products that were marketed in the United States as of August 8, 2016, and had a PMTA filed by September 9, 2020, and are either: (1) still undergoing FDA review; or (2) denied authorization by FDA, provided that they are subject to ongoing litigation. Miss. Code Ann. §§ 75-102-1(d); 75-102-2(1), (10). This was the timeframe in which manufacturers submitted PMTAs for ***tobacco***-derived nicotine ENDS products. In 2020, ***non***-tobacco-derived ENDS products were not subject to FDA regulation. Because they were only made subject to FDA regulation in 2022,[11] those products are not permitted to apply to be on the Mississippi registry.

ENDS products not listed in the Commissioner's directory are subject to seizure; manufacturers and sellers are liable for civil fines; for continued violations, ***private actors*** may enforce this law as a deceptive trade practice violation. *See* Miss. Code Ann. § 75-102-2(9)(d), (10)(d), (11)(a)-(d). The state directory will be dramatically different from the FDA directory that will be published pursuant to FDA's *2026 Guidance for Industry*. The state directory, though based on FDA's PMTA process, uses very different criteria (as explained above) in applying the PMTA status of a manufacturer or seller. H.B. 916 is thereby setting new ENDS premarket requirements that dramatically differ from FDA's PMTA process. Thus,

[11] As explained *supra* in section (I)(b), FDA's jurisdiction over non-tobacco-derived ENDS products began with the enactment of 21 U.S.C. § 321(rr)(1) in 2022.

H.B. 916 takes the reins from FDA to enforce the FDCA; it permits noncompliance for some products and compels compliance for others based upon selective application of the TCA's PMTA process. It deputizes the Commissioner (and sometimes ***private litigants***) to enforce those federal tobacco product standards.

This is state-level, selective enforcement of FDA's premarket authorization requirements. Basically, H.B. 916 permits the sale of tobacco-derived ENDS products but not non-tobacco-derived ENDS products, which are subject to the same PMTA statute the Commissioner supposedly seeks to enforce ***better than*** FDA. H.B. 916's incorporation of the TCA unlawfully adds state-level requirements to the premarket review process by mandating strict compliance with the FDCA for non-tobacco-derived ENDS products. This effectively results in a ban on non-tobacco-derived ENDS products for the foreseeable future because FDA's policy not to approve PMTA applications renders premarket authorization ***impossible***.[12]

**d. Harms caused by the Commissioner's enforcement of H.B. 916.**

Plaintiffs sell non-tobacco-derived ENDS products that are illegal under H.B. 916. Prior to enforcement of H.B. 916, Plaintiffs The Smokey Guys Inc., Byram Vape Empire Inc., MS Vapors LLC, and Vape Empire Inc. generated approximately 40% of their revenue from vapor product sales, 90% of which was attributable to

[12] Of the thousands of PMTAs submitted for ENDS products, only forty-five have been granted premarket authorization. *See Searchable Tobacco Products Database*, FDA, https://www.accessdata.fda.gov/scripts/searchtobacco/ (last visited June 2, 2026).

non-tobacco-derived ENDS products. ROA.409-412, ROA.450-451. Approximately $225,000.00 of their inventory would become subject to seizure. ROA.409-412, ROA.450-451. They ***reasonably expected*** H.B. 916's enforcement would force closure of at least two stores and layoffs of several employees. ROA.409-412, ROA.450-451.

Plaintiffs Smoke City Lucedale LLC, Revive Lucedale LLC, Revive Hurley LLC, TJ Patel LLC, and NUP 2 LLC expected similar harm. Sales of non-tobacco-derived ENDS products comprised 27% of their revenue. ROA.413-414, ROA.451. Approximately $58,500.00 of their inventory would become subject to seizure. ROA.413-414, ROA.451. These Plaintiffs reasonably believed enforcement would force location closures and staff layoffs. ROA.413-414, ROA.451.

The imminent enforcement of H.B. 916 stopped ***all*** sales of Plaintiff Hema Monica LLC, a non-tobacco-derived ENDS distributor. ROA.415-417, ROA.451. Approximately $60,000.00—***all***—of its inventory would become subject to seizure, and it reasonably believed enforcement would force it to end business operations, close its warehouse, and terminate its employees. ROA.415-417, ROA.451. The association Plaintiffs reasonably believed enforcement would undermine their financial support, advocacy, and programs. ROA.225-230, ROA.452.

H.B. 916's criminal penalties went into effect on October 1, 2025, and the Commissioner began civil enforcement on approximately November 30, 2025. *See*

Miss. Code Ann. § 75-102-2. Plaintiffs have been severely harmed by enforcement. Plaintiffs The Smokey Guys Inc., Byram Vape Empire Inc., MS Vapors LLC, and Vape Empire Inc. have experienced a 50% reduction in total revenue and cannot sell approximately $250,000.00 in inventory. ROA.874-875. Continued enforcement will likely force the closure of MS Vapors LLC and Vape Empire Inc. and several employee layoffs. ROA.874-875.

Similarly, Plaintiffs Smoke City Lucedale LLC, Revive Lucedale LLC, Revive Hurley LLC, TJ Patel LLC, and NUP 2 LLC have lost 40% of revenue. ROA.876-877. Continued enforcement will likely require closure of Revive Hurley LLC and several employee layoffs. ROA.876-877. Enforcement stopped 100% of Plaintiff-Appellant Hema Monica LLC's sales. ROA.878-879.

Plaintiffs Vapor Technology Association and MS Small Business Alliance have suffered organizational injuries because countless Mississippi retail and distributor members will be or have been forced to close or drastically reduce operations, which has undermined the associations' abilities to advocate for their members. ROA.225-230; ROA.17-18.

These harms—both prior and during enforcement—have been concrete, particularized, and experienced by each litigant. There is no legal remedy because recovery against the State is impossible, *see City of Austin v. Paxton*, 943 F.3d 993, 1003 (5th Cir. 2019), and regardless, the destruction of businesses cannot be cured

by money damages.[13] Furthermore, Plaintiffs have experienced the constitutional injury of suffering unlawful state enforcement of federal law.

## II. Procedural history.

Plaintiffs filed this lawsuit on November 12, 2025. ROA.14-42. On November 13, 2025, Plaintiffs filed an Urgent and Necessitous Motion for Temporary Restraining Order and Preliminary Injunction ("Motion for Preliminary Injunction"). ROA.232-235. Following briefing and a hearing, the District Court denied preliminary injunctive relief on November 25, 2025. ROA.652-672, RE.18-38. The District Court addressed only the first preliminary injunction factor, the likelihood of success, and held as a matter of law that Plaintiffs were unlikely to show preemption. ROA.658-668, RE.24-34.[14]

Following denial, on November 25, 2025, the District Court ordered the parties to file supplemental briefs on standing. ROA.673-674. Following briefing, the District Court dismissed this action for lack of standing and entered a final judgment on December 15, 2025. ROA.848-858, RE.39-49. The District Court's standing analysis was guided by its erroneous belief that ENDS products are

---

[13] *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (there is irreparable harm "where the potential economic loss is so great as to threaten the existence of the movant's business.").

[14] The District Court further rejected Plaintiffs' equal protection claims as grounds for a preliminary injunction. Discovery will later reveal facts supporting a permanent injunction on equal protection grounds.

federally illegal because FDA's "deferred enforcement period has now expired." ROA, 850, RE.41.

On December 15, 2025, Plaintiffs appealed the denial of Plaintiffs' Motion for Preliminary Injunction. ROA.846-847, RE.14-15. On January 5, 2026, Plaintiffs appealed the dismissal of this lawsuit for lack of standing. ROA.918-919, RE.16-17. This Court consolidated those appeals. [Dkt. #16].

Plaintiffs moved this Court for an injunction pending appeal. [Dkt. #23]. A motions panel denied Plaintiffs' Motion, holding that Plaintiffs had forfeited standing for failing to reassert their "financial injury" arguments, which Plaintiffs had raised in the District Court. *Vapor Tech. Ass'n v. Graham*, 167 F.4th 302, 306 (5th Cir. 2026). This Court's motions panel did not address the merits of Plaintiffs' standing, nor did it dismiss this appeal for lack of standing. *See id.* This appeal on the merits follows.

## SUMMARY OF THE ARGUMENT

(1) The District Court erred by dismissing this lawsuit for lack of Article III standing. Standing requires injury, causation, and redressability, which is satisfied with a lesser showing at this stage of litigation. Plaintiffs have suffered severe financial and constitutional harms by enforcement of H.B. 916, which are redressable through the injunctive and declaratory relief sought in this lawsuit. The legal status of ENDS products does not change this analysis because the Supreme

Court abandoned the legal interest test. *See Ass'n of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153-54 (1970). At most, the Supreme Court requires the litigant suffer the injury complained of and not be a mere bystander. Injury in fact is met here along with causation and redressability. Associational standing is further satisfied because the association Plaintiffs have members suffering mission-related injuries from enforcement of H.B. 916.

(2) The District Court further erred in denying Plaintiffs' Motion for Preliminary Injunction because Plaintiffs have a substantial likelihood of prevailing on their preemption claim and the other relevant factors support a preliminary injunction. H.B. 916 conflicts with and is preempted by the exclusive discretion Congress granted FDA in 21 U.S.C. § 337(a) to enforce the premarket authorization requirements established in 21 U.S.C. § 387j. The TCA's preservation and savings clauses in 21 U.S.C. § 387p do not change this conclusion because H.B. 916: (1) is not a sales regulation; and (2) impermissibly compels compliance with the TCA's premarket review requirements in 21 U.S.C. § 387j. Furthermore, H.B. 916 alters the premarket review process by imposing different enforcement penalties and, therefore, violates the preemption clause in 21 U.S.C. § 387p(a)(2)(A). Finally, Plaintiffs have suffered irreparable financial harm, and the Commissioner has no legitimate interest in enforcing an unconstitutional law.

## ARGUMENT

## I. The District Court erred by dismissing this lawsuit for lack of standing.

Plaintiffs have standing to challenge H.B. 916 based on the concrete and particularized financial and constitutional harms they have suffered through the Commissioner's enforcement of H.B. 916. These harms are redressable through the relief requested in this lawsuit. Furthermore, the association Plaintiffs have standing based on these injuries to their members. Thus, the District Court erred by dismissing this lawsuit for lack of standing.

### a. Standard of review.

"This court reviews questions of standing *de novo*." *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013) (citation omitted).

### b. Plaintiffs have shown standing to challenge H.B. 916 at the preliminary injunction stage of litigation.

"To establish standing…a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "At earlier stages of litigation…the manner and degree of evidence required to show standing is less than at later stages." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020), *as revised* (Oct. 30, 2020). "At the preliminary injunction stage, the movant must…show only that each element of standing is ***likely*** to obtain." *Id.* (emphasis added). Parties have standing to pursue pre-enforcement lawsuits to

challenge laws that will negatively impact them. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 580-84, 588 (2023).

Plaintiffs have shown standing because: (1) Plaintiffs have been financially and constitutionally harmed. (2) This harm has been caused by the Commissioner's intended enforcement of H.B. 916 against them. And (3) this Court can redress these harms by enjoining enforcement of H.B. 916.

The District Court, however, held that Plaintiffs lacked standing under its injury in fact analysis because "there is no legally protected interest to commit a crime." ROA.852, RE.43. Its premise was that these ENDS products have not been granted premarket authorization by FDA, as required by the FDCA. The District Court was guided by its erroneous belief that ENDs products are illegal because FDA's "deferred enforcement period has now expired." ROA.850, RE.41. This belief by the District Court is demonstrably wrong, as evidenced by FDA's *2026 Guidance for Industry*. The District Court ignored that Plaintiffs have a legitimate basis for believing FDA will continue allowing the sale of these ENDS products. This legitimacy was most recently fortified in FDA's *2026 Guidance for Industry*, which provides that "FDA generally does not intend to prioritize enforcement of the premarket authorization requirement" against ENDS devices that have satisfied certain threshold application filing requirements. *See Id.* at 3. There can be no

question that FDA, by virtue of its discretionary enforcement authority, has made ENDS products without premarket authorization functionally legal.

The only authority from this Court cited by the District Court is *Bell v. Redflex Traffic Sys., Inc.*, 374 F. App'x 518 (5th Cir. 2010) (unpublished). In *Bell*, the plaintiffs admittedly committed a traffic violation, conceded the validity of the traffic law, and paid the resulting fine. *See id.* at 519. They did not assert a right to continue committing traffic violations. Instead, they sought financial compensation from the company that had installed the city's traffic cameras. *Id.* Their argument was not that they had a right to violate the law but that their violations "would not have been discovered were it not for Redflex['s cameras]." *Id.* at 520.

This lawsuit falls outside the narrow—and nonprecedential—holding in *Bell*. Here, Plaintiffs assert the right to continue selling ENDS products based on FDA's repeated and clearly stated policy of allowing the sale of these products, predicated on FDA enforcement on a "case-by-case" basis and, more recently, FDA's *2026 Guidance for Industry*.[15] This distinction is critical here because the Supreme Court recognizes "that when an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights." *Heckler*, 470 U.S. at 832 (emphasis in original). FDA's refusal to enforce the FDCA against these ENDS products nullifies *Bell*'s application here.

---

[15] *Guidance for Industry* at 9.

The *Bell* plaintiffs conceded their conduct was proscribed; here, Plaintiffs seek relief from enforcement of a state law that ended their longstanding ability to sell these products as permitted under FDA's exclusive enforcement of the FDCA. To hold Plaintiffs lack standing here would nullify the Supremacy Clause and greenlight illegal state enforcement of federal law. State actors could violate federal law with impunity against challenge by the objects of their enforcement. That would eviscerate vital principles of federalism.

It is undisputed that Plaintiffs sold these ENDS products to the public prior to H.B. 916. Standing is only at issue because the District Court ignored Congress's explicit grant of exclusive enforcement authority and discretion to FDA. If the Commissioner is enjoined from enforcing H.B. 916, then these ENDS products will again be sold to the public in Mississippi, subject to discretionary enforcement by FDA. This case is different from *Bell* and other comparators of plainly illegal conduct.

Moreover, the District Court erred in treating the requisite "legally protected interest," ROA. 852, RE.43, as if it were the "legal interest" previously rejected by the Supreme Court. *See Camp*, 397 U.S. at 153-54. In *Camp*, the Supreme Court held that the "'legal interest' test goes to the merits" while "[t]he question of standing is different." *Id.* at 153. Thus, the Supreme Court no longer permits courts to

prejudge in a standing analysis whether plaintiffs have stated a claim for which relief can be granted.

The Supreme Court adopted the modern analysis for standing in *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992). Critically, the Supreme Court in *Lujan* ***did not*** revive the legal interest test or allow courts to prejudge the legality of interests. *See United States v. Johnson*, 632 F.3d 912, 919 (5th Cir. 2011) (rejecting "the long-since-repudiated 'legal interest' test [in favor of] *Lujan*."). The *Lujan* Court merely required plaintiffs to allege an injury to a "legally protected interest" for standing. 504 U.S. at 560. "When the *Lujan* Court used the phrase legally protected interest [it] did not mean to suggest a return to the old legal right theory of standing rejected in…*Camp*…" *Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 454 (6th Cir. 2013) (cleaned up). This Court and several of its sister circuits have rejected the District Court's interpretation of the legal interest requirement.[16] *See Texas Trib. v. Caldwell Cnty., Texas*, 121 F.4th 520, 526 (5th

---

[16] *See, e.g., Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 164 (3d Cir. 2017) ("[W]hether a plaintiff has alleged an invasion of a 'legally protected interest' does not hinge on whether the conduct alleged to violate a statute does…violate the statute. Were we to conclude otherwise, we would effectively collapse our evaluation under…12(b)(6)…into an Article III standing evaluation."); *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 959 (8th Cir. 2011) ("When the Supreme Court used the phrase legally protected interest as an element of injury-in-fact, it made clear it was referring only to a cognizable interest.") (cleaned up); *Parker v. D.C.*, 478 F.3d 370, 377 (D.C. Cir. 2007), *aff'd sub nom. D.C. v. Heller*, 554 U.S. 570 (2008) (same); *In re Special Grand Jury 89-2*, 450 F.3d 1159, 1172 (10th Cir. 2006) ("[T]he [Supreme] Court has made clear that a plaintiff can have standing…even though the interest would not be protected by the law in that case.").

Cir. 2024) (noting difference between "a merits-based analysis, which considers the sufficiency of a litigant's claim [that was abandoned in *Camp*], [and] a standing analysis [under *Lujan*], which considers 'whether the litigant is entitled to have the court decide the merits of the dispute.'") (citation omitted); *see Johnson*, 632 F.3d at 919 (similar).

At most, *Lujan*'s "legally protected interest" means "a cognizable interest," which can be "purely esthetic." 504 U.S. at 562-63. The Supreme Court has subsequently stated that this interest can be met by a plaintiff showing harm to its "property or money." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). This interest requires only that "the plaintiff cannot be a mere bystander, but instead must have a 'personal stake' in the dispute." *FDA*, 602 U.S. at 379 (citation omitted). "The injury in fact requirement prevents the federal courts from becoming a 'vehicle for the vindication of the value interests of concerned bystanders.'" *Id.* at 382 (citation omitted). This Court has applied this "personal stake" interpretation of the interest requirement. *See Texas Trib.*, 121 F.4th at 526 ("The initial standing requirement, injury in fact, helps ensure that the plaintiff has 'a personal stake in the outcome of the controversy.'") (citation omitted); *Nat'l Ass'n for the Advancement of Colored People, NAACP v. Tindell*, 95 F.4th 212, 216 (5th Cir. 2024) (rejecting argument that "members of the Jackson community…have any legally protected interest in the [state-run trial] court's accountability to the Jackson local governing authority (of

which they [were] not even a part).") (cleaned up). Plaintiffs clearly have shown a "personal stake" in the outcome of this case by asserting severe financial and constitutional harms flowing from H.B. 916's enforcement against them. Thus, Plaintiffs have shown injury in fact and, therefore, standing.

Moreover, standing exists to challenge state laws that usurp exclusive federal enforcement discretion. *See, e.g., Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 913-16 (8th Cir. 2025) (immigration); *Jensen v. Rhode Island Cannabis Control Comm'n*, 160 F.4th 18, 27-28 (1st Cir. 2025) (recreational marijuana); *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015) (tax revenue from medical marijuana dispensary). It would produce absurd results to reject standing in the ***countless*** areas of federal enforcement discretion.[17] *See, e.g., Bouarfa v. Mayorkas*, 604 U.S. 6, 8 (2024) ("A common feature of our Nation's complex system…is mandatory statutory rules paired with discretionary exceptions."). Because FDA has

[17] Holding that Plaintiffs lack standing here would spell disaster for the legion products sold in domestic markets that lack FDA's statutory authorization but are subject to FDA's policy of deferred enforcement. *See, e.g., Unapproved Drugs*, FDA (May 9, 2024), https://www.fda.gov/drugs/enforcement-activities-fda/unapproved-drugs (permitting sale of certain drugs "even though they have never received the required FDA approval."). Such holding would also foreclose many lawsuits against marijuana dispensaries. If a medical marijuana dispensary refused to sell a patient medical marijuana based on race, then that patient would be unable to sue the dispensary for discrimination because the interest vindicated would be the purchase of marijuana, which is federally illegal even though it too is subject to enforcement discretion. *See* 21 U.S.C. § 844; 21 C.F.R. § 1308.11(d)(23). Perfect compliance with all law is ***not*** a prerequisite to standing; to hold otherwise would be utterly impractical.

exercised its discretion to permit the sale of these ENDS products, Plaintiffs have standing to pursue these claims regardless of any legal interest requirement.

Furthermore, there is no doubt this Court would have jurisdiction to adjudicate preemption if raised by Plaintiffs as a defense in an enforcement matter. The Commissioner so admitted in his Response to Plaintiff's Motion for Injunction Pending Appeal. *See* [Dkt. #29], at 12. It would defy reason to hold that Plaintiffs lack standing to pursue such a claim in an affirmative lawsuit when they would have standing to raise the same issue in an enforcement action. And it would defy logic to suggest that Plaintiffs should be forced to wait until they are criminally prosecuted to assert the same arguments.

Finally, in an analogous case involving a virtually identical state statute regulating non-tobacco-derived ENDS products, the Seventh Circuit expressly held that those plaintiffs, "[m]anufacturers, distributors, retailers, and users of" ENDS products, have standing to prosecute virtually identical claims because they "have a legitimate basis to believe they are engaged in legal economic activities" in the light of "the FDA['s] limited case-by-case enforcement." *Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976, 982 (7th Cir. 2026). Plaintiffs have shown standing to prosecute this lawsuit.

### c. Plaintiffs have further shown associational standing.[18]

The District Court held that the association Plaintiffs lacked standing because the individual Plaintiffs had suffered no injury to a legally protected interest. ROA.856, RE.47. That was error.

"[A]n association may have standing…to vindicate" injuries, regardless of injury to the association. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Associational standing exists where:

> (1) [the association's] members would have standing to bring the suit; (2) the association seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation.

*NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025). The standing of one member is sufficient for an association to have standing. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 554 (1996).

Associational standing exists here. First, as stated above, the retailer Plaintiffs have suffered an injury. All these Plaintiffs are members of the MSSBA, and most are members of VTA. ROA.228, 843. Second, the association Plaintiffs' interests in this lawsuit are germane to their organizational missions relative to the vapor

[18] Regardless, "the presence of one party with standing…satisf[ies] Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

industry. ROA.843.[19] Third, this lawsuit does not require participation of individual members because these "'claims can be proven by evidence from representative injured members' and 'the participation of [certain] individual members does not thwart associational standing.'" *NetChoice, L.L.C.*, 134 F.4th at 805 (alteration in original). Associational standing is especially applicable in lawsuits for injunctive and declaratory relief. *See United Food*, 517 U.S. at 554 ("Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind."). Thus, the association Plaintiffs have standing.

**d. This Court's motions panel holding does not bind this Court's merits panel standing analysis.**

Although this Court's motions panel held that standing was forfeited as to its analysis of Plaintiffs' Motion for Injunction Pending Appeal, *see Graham*, 167 F.4th at 306, that holding has no effect on this Court's merits analysis.[20] In apparent

[19] *See* ROA.843 ("VTA represents the vapor product industry, and its purpose includes supporting its members in 'developing and selling vapor products that provide adult smokers with an alternative to combustible cigarettes,' [and] educating 'lawmakers, other government officials, and the public on the facts about ENDS products and the impact that legislative and regulatory proposals would have on public health both at the federal and state levels, including Mississippi,'…MSSBA 'educates lawmakers, other government officials, and the public on facts about ENDS products and the impact that legislative and regulatory proposals would have on public health in Mississippi.'").

[20] The Commissioner's motions panel briefing to this Court supports this conclusion; the Commissioner argued that Plaintiffs' decision not to brief their equal protection claims to the motions panel in this Court "forfeited [those claims] ***at this stage***"—not that those claims were forfeited in the merits appeal or subsequently barred in this lawsuit. [Dkt. #29], Response at 19 (emphasis added).

recognition of this limitation, this Court's motions panel ***did not*** dismiss this appeal for lack of jurisdiction. *See id.* at 307.[21]

Well-settled Fifth Circuit caselaw holds that "a merits panel is not bound by a motions panel." *Trevino v. Davis*, 861 F.3d 545, 548 n.1 (5th Cir. 2017); *Veasey v. Abbott*, 870 F.3d 387, 392 (5th Cir. 2017) (motions panels address "only the issues necessary to rule on the motion to stay pending appeal" and their "determinations are for that purpose and do not bind the merits panel."). "And, the merits panel must be especially vigilant where…the issue is one of jurisdiction." *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 704 (5th Cir. 1997) (subsequent history omitted) (citation omitted). Furthermore, motions panel rulings lack precedential status. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 502 n.8 (5th Cir. 2026) ("[A] motions panel decision…would not be entitled to precedential status before an oral argument panel in this court…"). Consequently, this Court should review standing *de novo* based on the merits briefing in this appeal.[22]

---

[21] Furthermore, it is illogical to apply a binding forfeiture from a supposed briefing deficiency in a motions proceeding, where the word volume limit is a mere 5,200 words, to the merits appeal, where the word volume limit is 13,000 words. *See* Fed. R. App. P. 27(d)(2)(A); 32(a)(7)(B)(i).

[22] Furthermore, Plaintiffs respectfully assert that the motions panel erred in holding that standing was forfeited in the motion proceeding by not alleging financial harm. Plaintiffs' Motion and Reply included several references to standing and Plaintiffs' financial injuries in fact.

- "Plaintiffs have shown standing because: (1) Plaintiffs and their members have been and will be harmed by; (2) Defendant's enforcement of H.B. 916; and (3) the Court can redress these harms by enjoining enforcement of H.B. 916." [Dkt. #23], Motion, at 12.

## II. The District Court erred by denying preliminary injunctive relief.

The District Court denied injunctive relief because "Plaintiffs…have not…demonstrate[ed] a substantial likelihood of success on…their" preemption claim. ROA.672, RE.38. That was error.

### a. Standard of review.

---

- "Since the enforcement of H.B. 916, [Plaintiffs] have experienced an approximately 50% reduction in total revenue, and they have lost approximately $250,000.00 in inventory that cannot be legally sold." *Id.* at 10.
- "Continued enforcement of H.B. 916 will likely force the closure of two of these parties' stores and the layoffs of several full-time employees." *Id.* at 11.
- "Similarly, [Plaintiffs] have lost approximately 40% of revenue and the ability to sell $58,500.00 of inventory." *Id.*
- "Continued enforcement will likely require closure of Revive Hurley LLC and the layoffs of several employees." *Id.*
- "H.B. 916 stopped 100% of [Plaintiff's] sales" and "[a]pproximately $60,000.00 in inventory became subject to seizure." *Id.*
- "And parties aggrieved by enforcement of unconstitutional state laws must have standing to challenge them." *Id.* at 14.
- "These are the interests Plaintiffs-Appellants have standing to defend against H.B. 916 even though the FDA has deferred a decision on authorization for ENDS products." *Id.* at 15.
- "Although neither the District Court nor the Commissioner disputes that all three parts of the standing test are met…the Commissioner argued that these injuries are 'not an "invasion of a legally protected interest"' because the sale of unapproved ENDS products violates the FDCA." [Dkt. #35], Reply, at 3.
- "Certainly, Plaintiffs-Appellants arguably have an interest in resisting the Commissioner's efforts to damage their businesses by the unconstitutional enforcement of the FDCA." *Id.* at 4.

The motions panel noted that Plaintiffs briefed financial injury before the District Court. *See Graham*, 167 F.4th at 306. Because the District Court's holding of a lack of standing was based on the erroneous conclusion that "there is no legally protected interest to commit a crime," ROA.852, RE.43, Plaintiffs emphasized the constitutional harm in the motions proceeding. Plaintiffs, however, still briefed their financial injuries to the motions panel. Thus, there was no forfeiture.

This Court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Rest. L. Ctr. v. D.O.L.*, 66 F.4th 593, 597 (5th Cir. 2023) (citation omitted). Whether a state statute is preempted is a legal conclusion, so the District Court's preemption holding is reviewed *de novo*. *See Cole v. City of Dallas*, 314 F.3d 730, 732 (5th Cir. 2002) ("We review de novo the district court's rulings on preemption."); *McCraw*, 719 F.3d at 343 ("We examine *de novo* the constitutionality of state statutes."). "The district court abuses its discretion…in deciding whether to grant a preliminary injunction [if it] relies on 'erroneous conclusions of law.'" *Atchafalaya Basinkeeper v. United States Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018) (citation omitted). Here, there are no disputed issues of fact, so review is *de novo*.

**b. Plaintiffs are entitled to a preliminary injunction.**

To obtain a preliminary injunction, a plaintiff must demonstrate four elements:

> (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.

*Siders v. City of Brandon, Mississippi*, 123 F.4th 293, 300 (5th Cir. 2024) (citation omitted). The District Court ruled as a matter of law that Plaintiffs were unlikely to prevail on the merits of their preemption claim. ROA.658-668, RE.24-34. This

ruling pretermitted review of the other preliminary injunction factors. ROA.671-672, RE.37-38. The District Court erred in ruling Plaintiffs' preemption claim was unlikely to prevail. The other preliminary injunction factors also support enjoining enforcement of H.B. 916.

**1. Plaintiffs have a strong likelihood of success on their preemption claim.**

H.B. 916 plainly seeks to enforce federal law in contravention of Section 337(a). *See* Miss. Code Ann. § 75-102-2(6) ("Failure to substantiate compliance with new federal requirements or standards shall be grounds for removal of the manufacturer and its ENDS products from the directory established in this section."). H.B. 916 compels ENDS products to undergo the PMTA process and requires some to obtain premarket authorization, a process inconsistent with FDA enforcement policy.[23]

Furthermore, H.B. 916 is preempted by Section 387p(a)(2)(A), which prohibits state interference with premarket review. Nor do the TCA's preservation and savings clauses prevent preemption. These clauses, also found in 21 U.S.C. § 387p, preserve state authority to impose ***tobacco sale bans***. But H.B. 916 is ***not*** a

[23] H.B. 916 deems some ENDS products legal without premarket authorization (i.e., tobacco-derived products), while the FDCA, via FDA's discretionary enforcement authority and policy, deems all ENDS products (including non-tobacco-derived products) as legal, subject to discretionary enforcement against those products whose PMTA applications are essentially "administratively incomplete." *2026 Guidance for Industry*, at 3.

sales statute. The meat of H.B. 916 is that it incorporates parts of the TCA's premarket review standard, which is ***not a sales statute***, in a manner to frustrate FDA's exclusive decision making and enforcement authority. In fact, Congress expressly forbade FDA from banning outright the ***sale of tobacco products***. *See* 21 U.S.C. § 387g(d)(3). State-level incorporation of the TCA does not convert the TCA into a sales statute. Nor do these provisions abrogate FDA's exclusive discretion to enforce the TCA's premarket authorization requirement on a case-by-case basis or in accordance with FDA's *2026 Guidance for Industry*. *See Heckler*, 470 U.S. at 831 (holding "that a [federal] agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."); *see also* 21 U.S.C. § 337(a).[24]

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted). "[S]tate law is naturally preempted to the extent of any conflict with a federal statute." *Id.* (citations omitted). This "implied conflict pre-emption" occurs "where state law 'stands as an obstacle to the accomplishment and

[24] The Commissioner cannot dispel preemption by couching state-level enforcement of federal premarket review requirements as a sale prohibition. *See Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013) ("Pre-emption is not a matter of semantics. A State may not evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect.").

execution of the full purposes and objectives of Congress.'" *Freightliner v. Myrick*, 514 U.S. 280, 287 (1995) (citation omitted).

"[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citation omitted). To determine this purpose, courts must examine "the federal statute as a whole and identify[] its purpose and intended effects." *Crosby*, 530 U.S. at 373. *Accord Abramski v. United States*, 573 U.S. 169, 179 (2014) (holding that in matters of statutory construction, courts "must (as usual) interpret the relevant words not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'") (citation omitted); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("Of course, words are given meaning by their context, and context includes the purpose of the text."). Here, a textual analysis read in the proper context shows that Congress intended Section 337(a) to preempt state laws like H.B. 916 that incorporate by reference and, therefore, enforce the TCA's premarket review requirements differently than FDA.

### A. 21 U.S.C. § 337(a) vests exclusive enforcement of the premarket review process with FDA, thereby impliedly preempting H.B. 916, which seeks to enforce the TCA's premarket review requirements.

Congress has expressed its clear intent that FDA be the sole enforcer of the FDCA. *See* 21 U.S.C. § 337(a) ("[A]ll such proceedings for the enforcement…of this chapter shall be by…the United States."). As such, the Supreme Court has held

that state law may not encroach on FDA's enforcement authority. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) ("The FDCA leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the [FDCA].") When Congress intends to permit states to enforce specific provisions of the FDCA, it does so explicitly. *See, e.g.*, 21 U.S.C. § 337(b) (listing exceptions related to food and setting out a detailed procedural process relating to state enforcement, including notice to FDA). No exception exists for the TCA's premarket authorization requirements, showing Congress intended sole federal enforcement of the TCA.

Even so, the Mississippi Legislature ignored Section 337(a) and enacted H.B. 916 to take the reins from FDA's enforcement of the FDCA. Specifically, H.B. 916 requires ENDS products to undergo the PMTA process and obtain federal premarket authorization. *See* Miss. Code Ann. § 75-102-2(1)(a). H.B. 916 then mandates enforcement actions based on whether a product has received FDA's premarket authorization, thereby creating a state enforcement regime that directly conflicts with the exclusive enforcement power vested in FDA by Congress. *See id.* at (6), (11). H.B. 916, however, does not require that tobacco-derived ENDS products receive premarket authorization so long as they are subject to pending PMTA applications submitted before September 9, 2020; of course, FDA did not yet have authority over non-tobacco-derived ENDS products at that time. *See id.* at (1)(b);

Section 75-102-1(d). Thus, H.B. 916, by intentional omission, bars any consideration for non-tobacco-derived ENDS products. The practical application of this exception under H.B. 916 is that Plaintiffs' ENDS products are illegal while the tobacco-derived ENDS products sold by large tobacco companies are legal, even though those products have not obtained premarket authorization, and even though FDA makes no distinction between these two products.

In short, H.B. 916 ***has deputized the Commissioner*** to bring enforcement actions based on PMTA compliance in ***his own name*** (using different standards than the TCA and the FDCA) even though Congress ***explicitly*** reserved enforcement to FDA. Furthermore, the Commissioner's enforcement of the FDCA through H.B. 916 is "inconsistent with federal policy and objectives." *Arizona v. United States*, 567 U.S. 387, 405 (2012). H.B. 916 completely overrides FDA's previously stated case-by-case enforcement policy and FDA's *2026 Guidance for Industry*, both prompted by FDA's reasonable concern that market removal of ENDS products would cause consumers to revert to much more harmful combustible cigarettes. Thus, H.B. 916 is preempted as an obstacle to the execution of the full purposes and objectives of Congress in enacting the FDCA and TCA.

*Buckman* demonstrates why H.B. 916 is preempted. In *Buckman*, the plaintiffs asserted state-law fraud claims based on an allegation that the defendant had obtained FDA approval of devices alleged to have injured plaintiffs by

submitting false reports to FDA. *See* 531 U.S. at 347. Yet the Supreme Court held that the plaintiffs' fraud claim, premised on an FDCA violation, sought to enforce the FDCA. Thus, the Supreme Court held that the plaintiffs' state-law claims "conflict[ed] with, and [were] therefore impliedly pre-empted by" the FDCA because of Section 337(a)'s preclusion against nonfederal enforcement of the FDCA. *Id.* at 348. The conflict in *Buckman* was that, through the prosecution of state-law claims premised on the FDCA, entities risked being held liable "in state court" for the very conduct already "deemed appropriate by the Administration" under the FDCA. *Id.* at 351. This case presents a similar conflict.

The Supreme Court in *Buckman* held that enforcement of the FDCA by someone other than FDA would "skew[] the "somewhat delicate balance of statutory objectives" of the FDCA. *Id.* at 348. Critically, the plaintiffs' "claims exist[ed] solely by virtue of the FDCA." *Id.* at 353. That is to say, Section 337(a) preempts the enforcement of state laws for which "the existence of [the FDCA] is a critical element." *Id.* Permitting such claims premised on violations of the FDCA "would exert an extraneous pull on the scheme established by Congress." *Id.*

*Buckman* further recognized that exclusive enforcement permits FDA "to make a measured response to" violations of the FDCA. *Id.* at 349. This is especially poignant here considering the FDCA's regulation of ENDS products, "under which

the FDA pursues difficult (and often competing) objectives." *Id.*[25] Congress assigned to FDA's "judgment and objectives" the task of regulating ENDS products while preventing reversion to traditional cigarettes; permitting state actors to use federal law to second guess FDA's judgment conflicts with congressional directive. *Id.* at 350; *see id.* at 352 (noting "clear evidence that Congress intended that the [FDCA] be enforced exclusively by the Federal Government.").

This Court has applied *Buckman* to hold that "[i]mplied preemption precludes state tort claims that 'exist solely by virtue of' the federal regulatory scheme," and that "[s]uch claims…cannot be brought under state law because the FDA is the exclusive enforcer of its regulations." *Wildman v. Medtronic, Inc.*, 874 F.3d 862, 868 n.6 (5th Cir. 2017) (citation omitted). This Court has extended *Buckman* to preempt state statutes. *See Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372 (5th Cir. 2012). In *Lofton*, this Court held that a state "fraud-on-the-FDA" statute was preempted, affirming a holding that "extending the holding of *Buckman* to fraud-on-the-FDA exceptions is warranted" because such statutory exceptions impermissibly allow factfinders to reach conclusions opposite those of FDA, thereby

[25] H.B. 916 further conflicts with Section 337 because of the downstream effects it will have on the ongoing premarket authorization process for ENDS products. *See id.* at 350 ("[C]omplying with the FDA's detailed regulatory regime in the shadow of 50 States'…regimes will dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress in enacting the FDCA…Would-be applicants may be discouraged from seeking [FDA] approval of devices with potentially beneficial…uses for fear that such use might expose the manufacturer…to unpredictable…liability.").

interfering with FDA's authority to police those it regulates. *Id.* at 375-80. Furthermore, this Court's sister circuits recognize that laws and claims that rely on the existence of the FDCA, i.e., seek to enforce the FDCA, are preempted by Section 337(a). *See, e.g., DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 40 (1st Cir. 2023) ("[W]e have made it clear that § 337(a) preempts any state-law claim that exists solely by virtue of an FDCA infraction.") (cleaned up); *Perez v. Nidek Co.*, 711 F.3d 1109, 1119 (9th Cir. 2013) (holding claim impliedly preempted because it "exist[ed] solely by virtue of the FDCA.") (citation omitted); *Loreto v. Procter & Gamble Co.*, 515 F. App'x 576, 579 (6th Cir. 2013) ("The Supreme Court supplied the test in *Buckman*: If the claim would not exist in the absence of the FDCA, it is impliedly preempted.").

Consequently, under *Buckman* and its progeny, Section 337(a) impliedly preempts H.B. 916 because it incorporates the TCA's premarket authorization requirements and impermissibly seeks to enforce the FDCA, which obviously upsets the "delicate balance" that Congress entrusted to FDA's "judgment and objectives." *Id.* at 348, 350.[26] This preemptive effect is equally applicable to FDA's discretionary enforcement decisions because FDA's exclusive enforcement extends to its

[26] Courts "assume that Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Thus, Congress knew that under *Buckman*, Section 337(a) would impliedly preempt any state law where the existence of the TCA was a critical element. Had Congress wanted to avoid preemption by the TCA, then it would have amended Section 337. It did not.

discretion "not to…enforce" the FDCA. *Heckler*, 470 U.S. at 831. Simply put, Section 337(a) preempts H.B. 916 because it seeks to enforce the FDCA and abrogates FDA's exclusive enforcement discretion.

Moreover, the differences in enforcement of H.B. 916 and the FDCA regarding premarket review show conflict preemption. In *Arizona v. United States*, 567 U.S. 387 (2012), the Supreme Court recognized that conflicting enforcement regimes (rather than conflicting substantive provisions) trigger conflict preemption. There, although a state statute "attempt[ed] to achieve one of the same goals as federal law," it created "a conflict in the method of enforcement," which "can be fully as disruptive…as conflict in overt policy." *Id.* at 406; *see id.* at 402 ("Permitting the State to impose its own penalties for the federal offenses here would conflict with the careful framework Congress adopted.").

Here, the most startling difference in enforcement is that FDA has deferred enforcement of the FDCA against ENDS products on a case-by-case basis (and now pursuant to FDA's *2026 Guidance for Industry*) and the Commissioner has not. As shown by FDA's *2026 Guidance for Industry*, FDA's policy of discretionary enforcement remains in effect, in direct contradiction to the District Court's belief that deferred enforcement had ceased. ROA.850, RE.41.

But the differences do not stop there; the active enforcement methods also differ. H.B. 916 enforces premarket review through civil fines, seizure of ENDS

products, criminal penalties and, for continued violations, via ***private suit*** as a deceptive trade practice. Miss. Code Ann. § 75-102-2. In contrast, FDA issues warning letters "to give individuals and firms an opportunity to take voluntary and prompt corrective action" prior to enforcement.[27] And although the FDCA authorizes enforcement through injunctive relief, 21 U.S.C. § 332, criminal and civil sanctions, §§ 333 and 335, and seizure, § 334, H.B. 916's civil and criminal penalties and seizure procedures are ***serially different*** from the FDCA's voluminous provisions.[28] Critically, the FDCA ***does not*** create a private right of action to enforce its premarket review requirements. *Arizona*'s logic applies with equal force here, showing preemption where Congress enacted a regulatory system to be enforced exclusively by FDA, and where H.B. 916 creates an undeniable "conflict in the method of enforcement." *Arizona*, 567 U.S. at 406.

Simply put, H.B. 916 "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner*, 514 U.S. at 287 (citation omitted). Congress clearly stated that only FDA can enforce the FDCA, including the premarket authorization requirements established by 21 U.S.C.

---

[27] *See* FDA, Regulatory Procedures Manual, July 2024, Ch. 4 Advisory Actions, § 4-1-1, *available at* https://www.fda.gov/media/71878/download.

[28] That is to say, the penalties imposed by the FDCA and H.B. 916, both civil and criminal, differ in several ways in amount and procedure. As an example, the FDCA imposes civil penalties of $15,000.00 per violation not to exceed $1,000,000.00 per proceeding, Section 333(f)(9)(A), whereas H.B. 916's civil penalties are $2,500.00 per product per day, Miss. Code Ann. § 75-102-2(11)(b).

§ 387j. H.B. 916, which is entirely dependent on the existence of the FDCA, violates FDA's exclusive enforcement of the FDCA by permitting state-level enforcement of the TCA's premarket review requirements through its directory, which is substantively different than FDA's enforcement priorities. *See 2026 Guidance for Industry*. This further violates FDA's discretion to enforce the FDA requirements in a discretionary method based on policy concerns. *See Heckler*, 470 U.S. at 831. At bottom, H.B. 916 alters federal requirements and displaces the enforcement structure that Congress designed, which poses an obstacle to the accomplishment and execution of Congress's intent. Thus, Section 337(a) impliedly preempts H.B. 916.

The District Court, however, declined to apply *Buckman*'s Section 337(a) preemption holding to this case because a panel of this Court recently stated in *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 338 (5th Cir. 2025), *cert. pending*, No. 25-257, that the *Buckman* "decision 'must be understood in context.'" ROA.664, RE.30. But the District Court misapplied *Zyla*. In *Zyla*, a panel of this Court rejected a preemption defense raised under Section 337(a) where a state statute "mirror[ed] federal law by making it illegal to sell any new drug that has not been approved under" the FDCA. 134 F.4th at 330. The *Zyla* panel rejected *Buckman* because *Buckman* supposedly "had nothing to do with state law mirroring federal requirements." *Id.* at 337.

*Zyla* is inapposite to H.B. 916. Under *Zyla*, mirrored state laws are permissible only if they regulate conduct "*in the same way*" as federal law. *Id.* at 330, 335 (emphasis in original). But H.B. 916 ***does not*** mirror federal law. It picks and chooses parts of the TCA's premarket standards to enforce and usurps FDA's sole discretion on what to enforce regarding premarket review. The directory mandated by FDA's *2026 Guidance for Industry* will be far different than the Commissioner's directory, given the criteria used by FDA and H.B. 916 are completely different.

But the non-mirroring does not stop there. H.B. 916 further imposes enforcement mechanisms (e.g., directory participation, private enforcement, civil fines, criminal penalties, and seizure procedures) that ***do not mirror*** the FDCA's black letter enforcement provisions. *See* Miss. Code Ann. § 75-102-2. Thus, H.B. 916's statutory enforcement mechanisms render *Zyla*'s "mirror" holding inapplicable here. *See also Arizona*, 567 U.S. 387 (preempting conflicting enforcement regimes).

Another difference is that H.B. 916 bars non-tobacco-derived ENDS products, whereas FDA does not, subject to case-by-case enforcement and FDA's *2026 Guidance for Industry* enforcement priorities. *See* Pub. L. No. 117-103, 136 Stat. 49, § 111(d)(2)(A) (2022). Furthermore, FDA's deferred enforcement policy requires only that the PMTA for non-tobacco-derived ENDS products be submitted

timely, yet H.B. 916 requires that FDA have granted premarket authorization for non-tobacco-derived ENDS products.[29] [30] FDA's 2026 enforcement priorities guidance creates an even starker difference: for tobacco-flavored ENDS products, it is enough that the application has been filed and accepted; for nontobacco-flavored ENDS products, the application must also include "data necessary to evaluate whether such product is appropriate for the protection of public health." *2026 Guidance for Industry*, at 3. FDA's upcoming directory of ENDS products that are unlikely to be subject to FDA enforcement will most certainly conflict with the Commissioner's own directory because H.B. 916 will prevent the largest category of products protected by FDA's 2026 Guidance from even being considered for the Commissioner's directory. H.B. 916's enforcement does not mirror federal enforcement in word or practice, so Plaintiffs' preemption claim survives *Zyla*.

Moreover, *Zyla*, a pharmaceutical industry case, is further inapposite because it did not involve the TCA's preemption clause under Section 387p, which prohibits state enactment of "a tobacco product…requirement which is different from, or in addition to…premarket review, adulteration [or] registration." 21 U.S.C. §

---

[29] These nonparallel enforcement regimes are even starker considering differences in enforcement priorities, such as FDA's policy of deferred enforcement of ENDS products. *See Zyla*, 134 F.4th at 335 ("[P]arallel standards…pose reduced risk to federal enforcement priorities as compared to non-parallel standards…").

[30] As previously pointed out, H.B. 916 does not require premarket authorization for tobacco-derived ENDS products. Instead, H.B. 916 allows these products to be sold if a PMTA was filed prior to September 9, 2020.

387p(a)(2)(A). *Zyla* involved 21 U.S.C. § 355(a), which does not include a preemption clause akin to Section 387p. Critically, *Zyla* relied on the notion that there was "no reason to think allowing [those] claims to proceed [would] in any sense upset any purposes and objectives of Congress whatsoever." *Zyla*, 134 F.4th at 338. Yet in the context of the TCA, Congress explicitly forbade states to regulate tobacco product standards such as premarket review. H.B. 916 further invades Congress's express grant of "flexible enforcement authority" to FDA to "promote less harmful tobacco products." Pub. L. No. 111-31, 123 Stat. 1776, 1782 (2009). Thus, even if *Zyla* governs in FDCA preemption cases, it will not bind this Court in this TCA case.[31] In short, *Zyla* should not be extended here.

Furthermore, the *Zyla* panel misinterpreted Section 337(a) by holding that "Section 337(a) only confers a cause of action upon the Federal Government to enforce the FDCA." 134 F.4th at 338 n.8. This is incompatible with the imperative language of Section 337(a) stating that enforcement "shall be by and in the name of the United States," language that can only mean that enforcement by others is ***forbidden***. *See Buckman*, 531 U.S. at 352 (noting "clear evidence that Congress

[31] The victorious party in *Zyla* offered a narrow construction of the *Zyla* opinion in response to the certiorari petition. "The Fifth Circuit did not consider whether the FDCA would preempt state laws that 'alter the federal requirements,' because Zyla's state-law claims do no such thing." *Wells Pharma of Houston, L.L.C., Petitioner, v. Zyla Life Sciences, L.L.C., Respondent.*, at 15 (U.S. Nov. 17, 2025) (No. 25-257) (citation omitted). H.B. 916 alters federal requirements, so *Zyla* does not bar reversal here.

intended that the [FDCA] be enforced exclusively by the Federal Government."). Moreover, that statement in *Zyla* ignores *Buckman*: "[Section 337(a)] leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance with the [FDCA]." *Id.* at 349 n.4.

*Zyla* relies on two principal cases in reaching its holding: (1) *California v. Zook*, 336 U.S. 725 (1949), which involved a state law that did not incorporate but closely mirrored a ***different*** federal law (the Motor Carrier Act) with "substantially the same provision," *id.* at 727; critically, this federal law ***did not*** have an exclusive enforcement provision like Section 337(a); and (2) *Wyeth v. Levine*, 555 U.S. 555 (2009), which involved a state common law claim for inadequate warning that could be decided even if the FDCA did not exist; thus Section 337(a) was ***not even raised*** in *Wyeth*. Furthermore, *Zyla* practically ignored *Nexus Pharms., Inc. v. Cent. Admixture Pharmacy Servs., Inc.*, 48 F.4th 1040 (9th Cir. 2022), where a claim that "relie[d] on a state statute which itself relie[d] on the" FDCA was barred by Section 337(a)'s "prohibition of private enforcement." *Id.* at 1046, 1050. *Zyla* should not be extended because it essentially ignored Section 337(a) in favor of caselaw that did not involve Section 337(a). Cases such as *Buckman* and *Nexus*, which properly recognize Congress's reservation of enforcement power to FDA, were decided differently from *Zyla* for this reason.

Finally, the panel ruling in *Zyla* also must be read in conformity with this Court's prior rulings under this Court's rule of orderliness. As stated above, this Court extended *Buckman* to preempt state tort claims and state statutes in *Wildman* and *Lofton*. No intervening caselaw has overturned those precedents. *Zyla* must be read in a limited fashion to maintain consistency with those prior holdings.

### B. The TCA's preservation and savings clauses do not overcome FDA's exclusive enforcement of the TCA's premarket review requirements.

H.B. 916 is preempted regardless of the TCA's preservation and savings clauses in Section 387p in the light of the express preemption clause in Section 387p and the exclusive enforcement provision in Section 337(a).

The preservation clause states that:

> Except as provided in paragraph (2)(A), nothing in this subchapter…shall be construed to limit the authority of…a State…to enact…any law…with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law… prohibiting the sale…of tobacco products…

21 U.S.C. § 387p(a)(1).

The preemption clause follows and states that:

> No State…may establish or continue in effect with respect to a tobacco product any requirement which is different from, or in addition to…premarket review, adulteration [or] registration…

*Id.* at (a)(2)(A) (emphasis added). The preservation clause is explicitly limited by the preemption clause. *See id.* at (a)(1) ("Except as provided in paragraph (2)(A) [the preemption clause]…"). Next, the savings clause states that the preemption

clause "does not apply to requirements relating to the sale…of…tobacco products…" *Id.* at (a)(2)(B). These clauses remain subject to Section 337(a)'s exclusive enforcement provision.

Section 387p has appropriately been referred to as a "preservation sandwich…whereby Congress has allowed the federal government to set the standards regarding how a product would be manufactured and marketed, but has left states…the ability to restrict or opt out of that market altogether." *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 555 (9th Cir. 2022). At most, "the Preservation Clause tells us that there is no 'field preemption' for the TCA." *R. J. Reynolds Tobacco Co. v. City of Edina*, 60 F.4th 1170, 1174 (8th Cir. 2023).

Together, these clauses permit states to ban outright the sale of tobacco products with the caveat that states cannot: (1) ***regulate tobacco product standards, including the TCA's premarket review standards***; or (2) ***enforce the FDCA***. H.B. 916 is preempted even considering these provisions for several reasons.

First, these clauses, regardless of their interpretation, do not alter an implied conflict preemption analysis. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873-74 (2000) ("The Court has thus refused to read general 'saving' provisions to tolerate actual conflict…in 'frustration-of-purpose' cases.") (citation omitted).

Second, although the preservation clause preserves state authority to enact more stringent or additional tobacco laws, the express preemption clause prohibits

such laws from interfering with premarket review. *See* 21 U.S.C. § 387p(a)(2)(A). H.B. 916's selective incorporation of the TCA's premarket authorization standards has plainly interfered with FDA's system of deferred enforcement of premarket review. Specifically, H.B. 916 adds a layer of state enforcement to the TCA's premarket review process and imposes different penalties for noncompliance. The Commissioner's compulsion of ENDS manufacturers to undergo the PMTA process and obtain premarket authorization further violates this limitation. To read Section 387p to allow market bans on sales based on premarket review standards different from those enforced by FDA improperly reads the prohibition on altering premarket review standards out of the statute. *See Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative…") (citation omitted).

Third, H.B. 916 is ***not*** a mere sales statute, so the savings clause does not protect H.B. 916 from the express preemption clause. Critically, H.B. 916 ***requires*** some—but not all—ENDS products ***to undergo and satisfy the TCA's premarket approval requirement***; it then punishes noncompliance with federal standards by omission from the Commissioner's directory of products permissible for sale and permits seizure of contraband products, among other penalties. *See* Miss. Code Ann. § 75-102-2. Holding that H.B. 916 is merely a sales statute would permit states selectively to condition market access of ***any product*** regulated by the TCA on

compliance with the parts of the FDCA that meet the state's preferences. State authority to enforce the FDCA would become limitless. Thus, H.B. 916 falls outside the preservation and savings clauses' exceptions.[32]

Fourth, the preservation clause's preservation of state authority to enact tobacco sale restrictions is still limited by Section 337(a)'s proscription against state enforcement of the FDCA. That is because the preservation clause's anti-limitation language applies only to ***only*** to laws in "***this subchapter***" (i.e., subchapter IX). 21 U.S.C. § 387p(a)(1) (emphasis added).[33] Critically, Section 337(a)'s grant of exclusive enforcement to FDA is codified in subchapter III. Thus, the preservation clause does not reach Section 337(a).

Courts must read these statutes in "harmony" rather than "conflict." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018) ("Allowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be*.") (emphasis in original). To read these statutes in harmony, Section 387p must yield to Section 337 as to exclusive

---

[32] Moreover, the preservation clause preserves the right of states to enact laws that are "in addition to, or more stringent than" the TCA. 21 U.S.C. § 387p(a)(1). It ***does not*** permit states to enact sales laws that are ***identical*** to the TCA. Enacting laws identical to the TCA would violate Section 337(a)'s mandate of exclusive federal enforcement. Thus, even if H.B. 916 is a sales ban, its incorporation of the TCA's premarket review process (which is plainly a product standard regulation and ***not*** a sales ban) places it outside the safe harbor of the preservation clause. *Id.*

[33] "[N]othing in this subchapter…shall be construed to limit the authority of…a State…to enact…any law…with respect to tobacco products." *Id.*

federal enforcement. To hold otherwise would judicially nullify Section 337(a). *See South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 510 n.22 (1986) ("It is an 'elementary canon of construction that a statute should be interpreted so as not to render one part inoperative.'") (citation omitted). Thus, even in the light of the preservation clause in Section 387p, states ***cannot*** enforce the TCA. Thus, H.B. 916 is preempted.

At bottom, H.B. 916 is preempted because it interferes with federal premarket review by enforcement of federal law. H.B. 916 deputizes the Commissioner as an FDA agent and middleman of regulation of ENDS products without any subservience to the FDA's enforcement priorities and discretions. Consequently, H.B. 916 is preempted.

**C. The Seventh Circuit erred in its preemption holding in an analogous case.**

In *Wisconsinites for Alternatives to Smoking & Tobacco, Inc. v. Casey*, 172 F.4th 976 (7th Cir. 2026), the Seventh Circuit affirmed the denial of a preliminary injunction involving a virtually identical state statute regulating non-tobacco-derived ENDS products. The Seventh Circuit, however, misread Section 337(a) and improperly applied the preservation and savings clauses of Section 387p. Although *Casey* is not binding on this Court, Plaintiffs wish to refute a few of its many flawed legal holdings.

The Seventh Circuit held that the plaintiffs "overread § 337(a), which limits only lawsuits that implicate adjudications of FDCA violations" and that "relying on the FDCA to provide a standard is different from enforcing the statute." *Id.* at 988-89. But that holding misunderstands that the analogous state law, just like H.B. 916, "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Freightliner*, 514 U.S. at 287. That holding further ignores *Arizona*'s preemption of "conflict[s] in the method of enforcement." *Arizona*, 567 U.S. at 406. Finally, the Commissioner's exclusion or inclusion of specific ENDS products on the state directory ***necessarily*** is an adjudication of the TCA's premarket authorization standards.

Regarding Section 387p, the Seventh Circuit held that the TCA preserved state authority to pass the virtually identical ENDS law, despite the "certain carveouts" of the preemption clause, because "the savings clause expressly safeguards the regulation of tobacco 'sale[s]' and 'distribution' from preemption." *Casey*, 172 F.4th at 988 (alteration in original). But, as stated *supra*, H.B. 916 is ***not*** a mere sales statute, so the preemption clause in Section 387p applies. *Casey* was wrongly decided by the Seventh Circuit and, therefore, should not be applied here.

### D. The presumption against preemption does not apply.

The District Court incorrectly applied a presumption against preemption. ROA.659, RE.25. This presumption does not "app[y] to the text of an explicit

preemption provision" because "the text ought to be given its fair meaning rather than a meaning narrowed by the presumption." SCALIA & GARNER, at 293; *Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute 'contains an express pre-emption clause,' we do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'"). Moreover, "[t]he presumption [against preemption] is readily overcome if state law would require something that federal law prohibits." SCALIA & GARNER, at 290. Because Sections 337(a) and 387p(a)(2)(A) prohibit state enforcement of the FDCA and alteration of the premarket review process, the presumption against preemption does not apply here. This Court must interpret the text according to its fair meaning: that H.B. 916 is preempted.

This presumption is further inapplicable because state enforcement of the FDCA is not "a field which the States have traditionally occupied." *Buckman*, 531 U.S. at 347 (citation omitted). Again, H.B. 916 compels compliance with "federal requirements [and] standards" under the FDCA at the peril of "removal…from the [Commissioner's] directory." Miss. Code Ann. § 75-102-2(6). H.B. 916 regulates subject matter that "originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347. H.B. 916 is entirely dependent on the FDCA. If Congress repealed 21 U.S.C. § 387j, then H.B. 916's enforcement

provisions would collapse. Consequently, "no presumption against pre-emption obtains in this case." *Id.* at 348.

This conclusion is clear because H.B. 916 depends on the "uniquely federal" provisions of the FDCA. *Lofton*, 672 F.3d at 378 ("[D]isclosures to the FDA are 'uniquely federal' and thus beyond the states' traditional police power…State laws that depend on such disclosures are not entitled to a presumption against preemption."). Regardless, this presumption is not dispositive. *See Sch. Bd. of Avoyelles Par. v. U.S. Dep't of Interior*, 647 F.3d 570, 582 (5th Cir. 2011) (applying "strong presumption against pre-emption" yet finding preemption.).

**2. The remaining factors support preliminary injunctive relief.**

Although the District Court pretermitted review of the other preliminary injunction factors based on its erroneous preemption merits holding, these factors strongly support injunctive relief. Plaintiffs have shown: (1) "a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted"; (2) "that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant"; and (3) "that granting the preliminary injunction will not disserve the public interest." *Siders*, 123 F.4th at 300 (citation omitted). Because the Commissioner, a government actor, is the defendant, the balance of equities and public interest factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**A. Plaintiffs are suffering irreparable harm.**

Irreparable harm may be shown by "financial injury" that "threatens the very existence of [a] business." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citation omitted). Plaintiffs are suffering irreparable harm from enforcement of H.B. 916: decreased revenue; imminent seizure of significant inventory; and imminent risk of closures and layoffs. ROA.409-417, ROA.450-451, ROA.874-879.

Irreparable harm is further present because Plaintiffs are likely to prevail on their preemption claim. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366 (1989) ("Irreparable injury may possibly be established…by a showing that the challenged state statute is…violative of express constitutional prohibitions.") (cleaned up); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012) (holding that preemption "alone constitute[d] irreparable harm.") (citation omitted). *See also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[T]he loss of constitutional freedoms 'for even minimal periods of time…unquestionably constitutes irreparable injury.'") (citation omitted).

Irreparable harm is also shown when financial injuries are "nonrecoverable" where the defendant "enjoy[s] sovereign immunity for any monetary damages." *Wages*, 16 F.4th at 1142. Here, the Commissioner is immune from monetary damages for Plaintiffs' financial injuries. *See Paxton*, 943 F.3d at 1003 ("When a

state agency is the named defendant, the Eleventh Amendment bars suits for…money damages…unless the state has waived its immunity.") (citation omitted).

Even if Plaintiffs choose to sell products not targeted by H.B. 916, they have still been irreparably harmed because "costs imposed on parties are irreparable where they cannot be recovered 'in the ordinary course of litigation.'" *Texas v. EPA*, 829 F.3d 405, 434 n.41 (5th Cir. 2016) (citation omitted). Swapping business models is obviously outside the ordinary course of litigation. *See also VanDerStok v. Garland*, 633 F. Supp. 3d 847, 855 (N.D. Tex. 2022) (subsequently "offering alternate products" does not repair "irreparable harm.") (citation omitted).

**B. The Commissioner and the public will not be harmed by enjoining enforcement of H.B. 916.**

Enjoining enforcement of H.B. 916 will not harm the Commissioner or the public. The injunction of a statute harms the government by its inability to enforce its laws, but the state has no interest in enforcing a law "that violates federal law." *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). As stated above, H.B. 916 violates federal law and is preempted. Furthermore, a preliminary injunction will not cause irreparable harm because FDA already enforces the FDCA and TCA under its exclusive authority to do so. *See also Bird*, 157 F.4th at 929 (finding Iowa would not be harmed by injunction of a state immigration statute, argued to parallel federal immigration law, because the federal government could continue to enforce

federal immigration law). An injunction will fulfill Congress's directive that FDA alone enforce the TCA. Thus, enjoining enforcement of H.B. 916 will not harm any governmental interest.

Moreover, enjoining enforcement of H.B. 916 will ***serve*** the public interest. *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 780 (5th Cir. 2025) (granting a preliminary injunction) ("The Government suffers no cognizable injury when a court halts unlawful…action…To the contrary, 'the public is served when the law is followed.'") (citation omitted); *Texans for Free Enter. V. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (similar). Consequently, Plaintiffs have shown the balance of equities heavily favors enjoining enforcement of H.B. 916.

## CONCLUSION

The District Court erred as a matter of law in denying Plaintiffs preliminary injunctive relief and further erred by dismissing this lawsuit for lack of standing. The Fifth Circuit should vacate and reverse the District Court's final judgment, reverse the denial of preliminary injunctive relief, and remand this matter to the District Court for entry of a preliminary injunction and further proceedings.

Respectfully submitted, this the 3rd day of June, 2026.

**Plaintiffs Vapor Technology Association; MS Small VTC Businesses Association Corporation, doing business as MS Small Businesses Alliance; Hema Monica, L.L.C.; The Smokey Guys, Incorporated; Byram Vape Empire,**

**Incorporated; MS Vapors, L.L.C.; Vape Empire, Incorporated; Smoke City Lucedale, L.L.C.; Revive Lucedale, L.L.C.; Revive Hurley, L.L.C.; TJ Patel, L.L.C.; and NUP 2, L.L.C.**

By: *<u>/s/ Charles E. Ross</u>*
CHARLES E. ROSS (MSB #5683)

Charles E. Ross (MSB #5683)
James C. Simpson, Jr. (MSB #6810)
Jack F. Hall (MSB #106482)
WISE CARTER CHILD & CARAWAY, P.A.
Post Office Box 651
Jackson, Mississippi 39205-0651
cer@wisecarter.com
jcs@wisecarter.com
jfh@wisecarter.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF SERVICE

I certify that on June 3, 2026, the foregoing document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Charles E. Ross*
CHARLES E. ROSS

# CERTIFICATE OF COMPLIANCE

This document complies with: (1) the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f) and 5th CIR. R. 32.1, it contains 12,971 words; and (2) the typeface requirements of FED. R. APP. P. 32(a)(5), and 5th CIR. R. 32.1 and the type-style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman and 12-point Times New Roman for footnotes) using Microsoft Word.

*/s/ Charles E. Ross*
CHARLES E. ROSS